## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IMANI RINGGOLD-D'ABELL and
LA'SHANNA TAYLOR,

        Plaintiffs,

    v.

CITY OF TAYLOR, MICHIGAN;
JEFFREY ADAMISIN; NICHOLAS
SELLITTI; ANTHONY PAREDES;
THOMAS HAVERLOCK; and JAMES
PILCHAK,

        Defendants.

Case No. 2:21-cv-12113

Hon.

## **COMPLAINT AND JURY DEMAND**

Plaintiffs Imani Ringgold-D'Abell and La'Shanna Taylor, through their counsel, Salvatore Prescott Porter & Porter, PLLC, bring this complaint against the City of Taylor, Michigan and its police officers, Jeffrey Adamisin, Nicholas Sellitti, Anthony Paredes, Thomas Haverlock, and James Pilchak. In support of their complaint, Plaintiffs state as follows:

## Introduction

1.    On September 13, 2019, a little girl who was supposed to be at her dentist appointment sat quietly in the backseat of her parents' car while her father's body was violently thrust against the outside of her seat's window. Over the next few minutes, the child would hear her father cry out as electric currents repeatedly shocked his body mere feet from where she sat alone, while an officer gripped her sobbing mother, who was screaming, "Stop! My daughter's in the car!"

2.    The genesis of this traumatic scene was a paperwork snafu. Plaintiff Imani Ringgold-D'Abell had a temporary paper driver's license while he awaited the permanent replacement that had not yet arrived, and the temporary tag on his car had detached during a car wash. But in lieu of accepting documentation and an explanation from Mr. Ringgold-D'Abell, who is a young Black man, Defendant Lieutenant Jeffrey Adamisin decided to arrest him, even after the officer had already confirmed that Mr. Ringgold-D'Abell's vehicle was in fact registered to him.

3.    Four other officers arrived to assist with Adamisin's arrest of Mr. Ringgold-D'Abell for being without a permanent hardcopy of his

driver's license. The five police officers brought Mr. Ringgold-D'Abell out of his vehicle to arrest him, and with no provocation, escalated the encounter to violence. Mr. Ringgold-D'Abell—encircled by the officers who far outnumbered him—was ultimately tased multiple times and suffered blows to his body, including an officer's punches to his stomach while another held his torso in place.

4.      During that time, Ms. Taylor, alarmed at the unprovoked assault on her partner, peacefully exited the vehicle. But officers aggressively pushed her back to the passenger seat with needless force and painfully restrained her arms. Ms. Taylor, exclaiming concern for her child, was handcuffed and put in a police car, while her daughter remained in the vehicle alone.

5.      Mr. Ringgold-D'Abell was arrested and charged with traffic violations and the misdemeanor offense of interference with police authority. In support of the latter charge, officers falsely claimed in police reports that Mr. Ringgold-D'Abell had been actively resisting arrest.

6.      What happened to Plaintiffs is no aberration. The Taylor Police Department's officers—including many of those involved in the assaults against Plaintiffs—have routinely used excessive force in the

past, particularly against people of color. Yet the City of Taylor has a custom of acquiescing to this practice and failed adequately to train and supervise its officers on the constitutional use of force.

7. Plaintiffs now bring this action to vindicate their civil rights under 42 U.S.C. § 1983, including claims that the officers used excessive force and unlawfully seized them in violation of their Fourth and Fourteenth Amendment rights and that the City of Taylor is subject to municipal liability for its policies and customs that caused the deprivation of their rights. Plaintiffs also bring claims against the officers under Michigan state law, including assault and battery, false arrest, and intentional infliction of emotional distress. Mr. Ringgold-D'Abell brings individual federal and state claims against the officers for maliciously prosecuting him and failing to intervene in the excessive force used against him.

### Parties

8. Plaintiff Imani Ringgold-D'Abell is a resident and citizen of Wisconsin.

9. Plaintiff La'Shanna Taylor is a resident and citizen of Michigan.

10.    Defendant City of Taylor is a municipal corporation organized under the laws of the State of Michigan.

11.    Upon information and belief, Defendants Jeffrey Adamisin, Nicholas Sellitti, Anthony Paredes, Thomas Haverlock, and James Pilchak, referred to in this Complaint as the "Defendant Officers," are residents and citizens of Michigan.

12.    The Defendant Officers were at all relevant times acting under the color of state law and in the course of and within the scope of their employment as police officers of the City of Taylor. The Defendant Officers are sued in their official and individual capacities.

### Jurisdiction and Venue

13.    This Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343(a) (civil-rights jurisdiction). The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

14.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred within this judicial district.

5

## Facts

15.   In September 2019, Plaintiff Imani Ringgold-D'Abell was enjoying his time as a young father in Michigan with his partner, Plaintiff La'Shanna Taylor, and their three-year-old daughter, having just relocated from his home in Illinois to be closer to Ms. Taylor's family.

16.   A few months earlier, Mr. Ringgold-D'Abell had purchased a used Audi SUV to get around in Michigan. He received a Temporary Registration Permit that would last 90 days, until September 27, 2019.

17.   Inconveniently, Mr. Ringgold-D'Abell misplaced his driver's license. Although Mr. Ringgold-D'Abell kept a picture of his driver's license on his cell phone to ensure that it was always with him, he went to the Illinois Department of Motor Vehicles and ordered a replacement for the physical license. The Illinois Department of Motor Vehicles provided Mr. Ringgold-D'Abell with a temporary paper driver's license to use for identification until the permanent card arrived in the mail.

18.   Not long after, a Michigan state police officer pulled Mr. Ringgold-D'Abell over in a routine traffic stop. Mr. Ringgold-D'Abell displayed his paper driver's license and explained that he had temporary

registration on his vehicle. With little fanfare, the officer accepted Mr.
Ringgold-D'Abell's explanation and issued no citation.

**The Initial Stop**

19.    On the morning of September 13, 2019, Plaintiffs were taking
their daughter to the dentist in Mr. Ringgold-D'Abell's vehicle. Mr.
Ringgold-D'Abell's replacement driver's license still had not arrived, but
he carried with him the temporary paper license and the photo of his old
Illinois license. The temporary registration was still active on Mr.
Ringgold-D'Abell's car, but the flimsy temporary tag that had been
hanging where the permanent license plate would soon go had been
swept away in a car wash. Mr. Ringgold-D'Abell had paperwork reflecting
his license plate number on hand.

20.    Defendant Jeffrey Adamisin, a lieutenant with the Taylor
Police Department, was on duty in a police car when he saw Plaintiffs
drive by as the family made their way to the dentist's office. Lieutenant
Adamisin activated his police car's lights, signaling to Mr. Ringgold-
D'Abell to pull over and stop. Mr. Ringgold-D'Abell immediately pulled
over and stopped his car.

21.     Lieutenant Adamisin exited the police car and approached the driver's side of Mr. Ringgold-D'Abell's vehicle. Mr. Ringgold-D'Abell was in the driver's seat, with Ms. Taylor next to him and their daughter sitting directly behind him. Lieutenant Adamisin asked Mr. Ringgold-D'Abell for his driver's license and registration. Mr. Ringgold-D'Abell showed the officer the photo of his Illinois driver's license and provided him with the car's license plate number, explaining that the temporary tag detached during a car wash. Mr. Ringgold-D'Abell also had his temporary paper driver's license, but Lieutenant Adamisin did not ask to see it.

22.     Lieutenant Adamisin returned to his police car and radioed for backup. Lieutenant Adamisin offered no explanation for why backup was needed. Four officers from the Taylor Police Department—Nicholas Sellitti, Anthony Paredes, Thomas Haverlock, and James Pilchak— arrived on the scene in response, all in police cars with their lights flashing.

23.     Officers Paredes and Pilchak exited their police cars and approached Lieutenant Adamisin, who was sitting in his car checking the information Mr. Ringgold-D'Abell had provided. Lieutenant Adamisin

expressed surprise that the plate number Mr. Ringgold-D'Abell provided was in fact registered to Mr. Ringgold-D'Abell. Officer Pilchak also expressed shock that Mr. Ringgold-D'Abell owned the Audi he was driving and had supplied correct information to Lieutenant Adamisin.

24.   Officer Pilchak then said, "I'm guessing he's suspended," speculating that Mr. Ringgold-D'Abell's driver's license was not active and in good standing. That conjecture was wrong—Mr. Ringgold-D'Abell's driving privileges were not suspended.

25.   Even though Mr. Ringgold-D'Abell had promptly and cooperatively provided correct information about his active Illinois driver's license and was carrying official documentation provided by the Illinois Department of Motor Vehicles, Lieutenant Adamisin decided to arrest him for failure to carry a driver's license.

**The Arrest and Assault**

26.   The Defendant Officers approached the vehicle, where Plaintiffs were sitting patiently waiting for the traffic stop to resolve so they could get their daughter to her appointment. Officer Paredes told Mr. Ringgold-D'Abell to turn the car off. Mr. Ringgold-D'Abell asked why. When Officer Paredes said that it was because he did not have an ID on

him, Mr. Ringgold-D'Abell again attempted to show his paperwork, explaining that he had ordered a new permanent card from Illinois.

27.   Officer Paredes opened the car door, reached inside, and grabbed Mr. Ringgold-D'Abell's wrist, telling him to step out of the car. Mr. Ringgold-D'Abell quickly responded, "Alright, I'm coming!" Officer Paredes maintained his grip on Mr. Ringgold-D'Abell's left arm and pulled him out of the car. The four other Defendant Officers formed a circle around Mr. Ringgold-D'Abell, standing close to him.

28.   When Officer Paredes abruptly pulled him out of the car, Mr. Ringgold-D'Abell was holding a lit cigarette. Officer Sellitti seized Mr. Ringgold-D'Abell's right arm, in an apparent effort either to take the cigarette or to handcuff him, while Officer Paredes continued to hold onto Mr. Ringgold-D'Abell's left arm. Mr. Ringgold-D'Abell remained calm and offered no resistance. Lieutenant Adamisin then rushed forward and violently shoved Mr. Ringgold-D'Abell's body against the side of the car, pressing his chest against the window where Plaintiffs' young daughter was sitting. The other Defendant Officers piled on, with Lieutenant Adamisin, Officer Paredes, and Officer Sellitti forcefully grabbing at Mr. Ringgold-D'Abell's body as it was firmly held against the vehicle.

29.    Ms. Taylor was scared by the situation's sudden turn to violence, particularly in front of her little girl. She stepped out of the vehicle but did nothing to interfere with the violence ensuing. Officers Haverlock and Pilchak approached Ms. Taylor, forcefully pushing her back to the passenger's seat. Once the officers had Ms. Taylor back at the car, Officers Haverlock and Pilchak aggressively and painfully restrained Ms. Taylor's arms, causing her to exclaim—"Stop! You're hurting me!" and "Stop! My daughter's in the car!" Officers Haverlock and Pilchak handcuffed Ms. Taylor. Officer Pilchak took Ms. Taylor behind the family vehicle before eventually placing her in a police car, all the while separating Ms. Taylor from her young daughter as the child witnessed the traumatic scene unfolding outside the car window.

30.    Meanwhile, Officer Paredes held Mr. Ringgold-D'Abell from behind in a bear hug, immobilizing him as Officer Sellitti began punching Mr. Ringgold-D'Abell directly in the stomach with a closed fist and Lieutenant Adamisin held onto Mr. Ringgold-D'Abell's body.

31.    With three sets of hands pulling him in multiple directions, Mr. Ringgold-D'Abell stumbled forward. Lieutenant Adamisin instructed, "Taser him." Officer Sellitti finally let go, and—though

Lieutenant Adamisin and Officer Paredes continued their grip—Mr. Ringgold-D'Abell was able to almost get his bearings, saying, "Alright!" Officers Sellitti and Paredes unholstered their taser guns. Lieutenant Adamisin again violently pushed Mr. Ringgold-D'Abell back to the side of the car, and Mr. Ringgold-D'Abell, whose belly was pressed against the vehicle, raised his hands above his head in hopes of deescalating the inexplicable violence that had just ensued.

32.    As Mr. Ringgold-D'Abell said "Alright!" and stood with his hands in the air, stomach flat against the vehicle, with Lieutenant Adamisin pinning him in place—Officer Sellitti discharged his taser, lodging probes into Mr. Ringgold-D'Abell's skin and sending painful electric currents through his body.

33.    Lieutenant Adamisin and Officer Paredes briefly removed their hands from Mr. Ringgold-D'Abell after he was tased. One of the Defendant Officers yelled, "Get on the ground!" and Mr. Ringgold-D'Abell, eager to comply and end the assault, replied, "Okay!" But as Mr. Ringgold-D'Abell made his way to the ground to obey the Defendant Officers' command, Officer Sellitti discharged his taser gun again,

shocking Mr. Ringgold-D'Abell for the second time. Mr. Ringgold-D'Abell said, "Alright!" and dropped to his knees.

34.     Officer Sellitti moved forward and forcefully shoved Mr. Ringgold-D'Abell's torso to the ground. What followed was Mr. Ringgold-D'Abell—on the ground and far outnumbered by the Defendant Officers who stood over him—continuing to be tased as he did nothing but attempt to obey the officers' commands.

35.     Once pushed to the ground, Mr. Ringgold-D'Abell lay on his back as Officer Sellitti stood immediately over him, with the taser gun threateningly pointed at Mr. Ringgold-D'Abell, and Officer Paredes grabbed onto Mr. Ringgold-D'Abell's arm. Mr. Ringgold-D'Abell held his hands out but close to his chest, attempting to show his continued efforts to comply with the officers' demands. Officer Sellitti was yelling at Mr. Ringgold-D'Abell to get on his belly, and Mr. Ringgold-D'Abell begged to be able to do so, saying, "Let me turn around!"

36.     After Officer Paredes released his grip, Mr. Ringgold-D'Abell turned over onto his stomach. Officer Sellitti held his taser gun pressed directly against Mr. Ringgold-D'Abell's back, and Defendant Officers shouted at Mr. Ringgold-D'Abell to put his hands behind his back. Right

away, Officer Paredes took hold of one of Mr. Ringgold-D'Abell's arms, pulling it at an angle behind Mr. Ringgold-D'Abell's torso. Before Mr. Ringgold-D'Abell had even a split second to try to dislodge his other arm, which was awkwardly placed under his bodyweight, Officer Sellitti discharged his taser gun, this time with the gun flush to Mr. Ringgold-D'Abell's body.

37.    The jolt of pain caused Mr. Ringgold-D'Abell to flip over onto his back, with Officer Paredes still holding onto his arm. Defendant Officers yelled, "Put your hands behind your back!" and Mr. Ringgold-D'Abell repeatedly exclaimed why he could not—"He's holding my hand!" A Defendant Officer told Mr. Ringgold-D'Abell to get back on his stomach, and Mr. Ringgold-D'Abell responded that he was trying to.

38.    Officer Haverlock rolled Mr. Ringgold-D'Abell onto his belly, pinned Mr. Ringgold-D'Abell under his knee, and used two hands to push Mr. Ringgold-D'Abell's face into the concrete below him. As Officer Haverlock and Officer Paredes held Mr. Ringgold-D'Abell down, Officer Sellitti continued to hold his taser gun to Mr. Ringgold-D'Abell's back, shouting, "You're going to get it again!"

39.    Officer Paredes handcuffed Mr. Ringgold-D'Abell while he remained on the ground, and Officers Haverlock and Sellitti took Mr. Ringgold-D'Abell to Lieutenant Adamisin's police car.

**The Immediate Aftermath**

40.    While Mr. Ringgold-D'Abell sat in the police car, in disbelief over the assault he had just suffered, the Defendant Officers discussed what had just happened. Officer Haverlock said that he was worried the altercation had ruined his new tattoo. Officer Sellitti bemoaned the fact that he was going to need two new cartridges for his taser gun.

41.    The Defendant Officers searched Mr. Ringgold-D'Abell's vehicle, finding nothing but candy. An officer asked Mr. Ringgold-D'Abell, "You got a candy smuggling ring or something?" Mr. Ringgold-D'Abell responded that he was selling candy as a fundraiser for his daughter.

42.    While searching Plaintiffs' vehicle, Lieutenant Adamisin confirmed to Officer Pilchak that Mr. Ringgold-D'Abell did in fact have a valid temporary license.

43.    Finally—after Plaintiffs' young daughter had spent about ten minutes in the family car alone, witnessing her father being beaten and

electrocuted and her mother handcuffed, sobbing, and crying out for her—the Defendant Officers released Ms. Taylor, who immediately made her way to comfort her daughter.

44.    Ms. Taylor later walked back over to the Defendant Officers to ask for their names, knowing that what the family had just suffered was unjust, and was told the officers' names would be in the police report. When Ms. Taylor walked away, one officer said, "Are you going to rearrest her?" and another said, "Should've just arrested her." Someone then asked, "What's her problem?" and Officer Haverlock replied, "We were being mean to her boyfriend."

45.    Glancing around at the elegant houses lining the quiet street in which a Black man had just been pulled over, beaten, and tased for lacking a plastic copy of his valid driver's license, an officer lamented: "It's too bad. It's a nice neighborhood."

**Mr. Ringgold-D'Abell's Prosecution**

46.    Lieutenant Adamisin issued Mr. Ringgold-D'Abell citations for speeding, lacking proof of insurance, a registration and/or plate violation, failing to display a valid license, and interfering with police authority.

47.   Mr. Ringgold-D'Abell was booked into the Taylor Police Department's jail, where he spent three days before posting bond and being released on pretrial conditions.

48.   Lieutenant Adamisin and Officer Sellitti wrote police reports about Mr. Ringgold-D'Abell's arrest that contained intentionally false statements, including that Mr. Ringgold-D'Abell had refused to obey the Defendant Officers' orders and was actively resisting arrest.

49.   Wayne County prosecutors charged Mr. Ringgold-D'Abell with the violations listed in the citations issued by Lieutenant Adamisin.

50.   The prosecutors offered to dismiss the criminal charges against Mr. Ringgold-D'Abell if he agreed to release civil claims Mr. Ringgold-D'Abell may have in connection with his arrest. Mr. Ringgold-D'Abell declined the offer.

51.   Charges against Mr. Ringgold-D'Abell remain pending.

**Plaintiffs' Injuries**

52.   Mr. Ringgold-D'Abell experienced excruciating physical pain during and after the assault. The encounter left him in a neck brace with bruising and scabs on his face where his skin was scraped against the concrete, pain in his upper back and neck from the contorted positions in

which the Defendant Officers held him, and bleeding from holes in his body where the taser probes had entered to deliver their shock.

53.    When Mr. Ringgold-D'Abell was booked into the Taylor Police Department's jail, he was bleeding from his face and head. But Mr. Ringgold-D'Abell's pleas for medical attention were initially ignored until he was finally permitted to see a doctor. The doctor offered Mr. Ringgold-D'Abell costly imaging tests that he could not afford, and Mr. Ringgold-D'Abell had to go without them. Mr. Ringgold-Abell sought and received treatment for his wounds upon release from the jail, including, at the advice of a physician, a tetanus shot to protect against a potential bacterial infection caused by his face being pressed into concrete.

54.    Plaintiffs also endured severe emotional distress. The experience branded in Plaintiffs a lesson that those sworn to serve and protect would do neither for them. Mr. Ringgold-D'Abell received mental-health treatment for trauma stemming from the Defendant Officers' assault on him, including a joint session with his daughter and Ms. Taylor. Plaintiffs continue to harbor concern about the developmental impact of the traumatic event on their young daughter, who to this day initiates discussion about the Defendant Officers' attack on her parents.

And the assault also strained Plaintiffs' relationship as the two struggled to deal with the fallout.

55.    The Defendant Officers caused Plaintiffs financial harm that altered their quality of life. Mr. Ringgold-D'Abell incurred medical costs, fees for his impounded vehicle, legal bills, and insurance costs, and, at the same time, the injuries that Mr. Ringgold-D'Abell sustained in the assault prevented him from working for weeks. The combined effect was that Mr. Ringgold-D'Abell was unable to keep his vehicle, and without transportation, he was forced to move home to live with his father. Ms. Taylor also had to take time off to care for her daughter, who was crying at night for days after witnessing the assault on her parents.

**"Welcome to Taylor": The City of Taylor's Policy and Custom of Using Excessive Force**

56.    Plaintiffs' experience of being subjected to excessive force at the hands of the Taylor Police Department was not an anomaly.

57.    The Taylor Police Department has a policy and practice of using excessive force, and while it regularly trains its officers about deploying force, the Department fails adequately to train and supervise them about using force in a manner that complies with constitutional requirements.

58.     The following are just a few examples of prior instances of Taylor police officers using force against citizens—often Black citizens—who posed no threat and provided no provocation:

a. In November 2014, Taylor police officers performed a traffic stop on Individual ST, a Black man. Officers yanked Individual ST out of his car and tased him multiple times. Officers, including Defendant Anthony Paredes, also beat Individual ST. Individual ST posed no threat of harm or flight, having done nothing but ask the reason for being stopped.

b. In March 2015, a Taylor police officer performed a traffic stop on Individual JN. Individual JN asked why she was pulled over. The police officer forcefully slammed Individual JN against a car, while she was handcuffed, and hit her. Other Taylor police officers—including Defendant Nicholas Sellitti—ordered Individual JN's passenger, Individual ML, out of the vehicle. The officers beat Individual ML.

c. In May 2015, Taylor police officers—including Defendant Officers James Pilchak and Nicholas Sellitti—confronted two men in friendly conversation in a Walgreens parking lot. The

officers threw both men to the ground and hit, kicked, and dragged one of them.

d. In March 2016, Taylor police officers performed a traffic stop on Individual CM, a Black man. Officers repeatedly punched Individual CM, kneed him, and tased him. The assault was captured on video.

e. In April 2016, Taylor police officers performed a traffic stop on Individual CJ, a Black man. Individual CJ wanted to know why he was pulled over. In response—and with no provocation or threat of harm or flight from Individual CJ—officers shattered Individual CJ's window, forcibly extracted him from the car, and choked him until he blacked out. The assault was captured on video.

f. In February 2019, Taylor police officers—including Defendant Nicholas Sellitti—performed a traffic stop on a vehicle in which Individual JB was a passenger. The officers knocked Individual JB to the ground, kicked him, and punched him.

59. The Department knew of these and other instances of Taylor police officers repeatedly using force unjustified by resistance or

provocation, having been made aware of these incidents through avenues including litigation and media coverage. The Department was therefore on notice that its training procedures, policies, and supervision with respect to the use of force were inadequate and likely to continue causing constitutional injuries. In fact, the Taylor Police Department knew that nearly all of the Defendant Officers who assaulted Plaintiffs had previously used excessive force.

60.    Despite having been made aware of its insufficient policies and practices on the constitutional use of force, the Taylor Police Department failed to take corrective action but rather acquiesced to its officers' continued unconstitutional use of force. In doing so, the Department was deliberately indifferent to the known and obvious need for policy changes to prevent such constitutional injuries.

61.    A more recent case is also illustrative. In April 2020, seven Taylor police officers pulled Individual BM over. Individual BM put his hands in the air, but officers forcibly extracted him from the car, punched him, and tased him when he was physically unable to get his arms free to be handcuffed. In a statement reminiscent of Jim Crow, an officer was caught on camera telling Individual BM, "Welcome to Taylor."

**Count I**
**Excessive Force**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**
**Plaintiff Imani Ringgold-D'Abell**
**Against Defendants Adamisin, Sellitti, Paredes, and Haverlock**

62.    Plaintiffs incorporate by reference the facts alleged above.

63.    Mr. Ringgold-D'Abell posed no threat to the Defendant Officers' safety. Nor did Mr. Ringgold-D'Abell actively resist arrest or attempt to evade arrest at any time.

64.    Defendants Adamisin, Sellitti, Paredes, and Haverlock used excessive force against Mr. Ringgold-D'Abell without just cause, including by repeatedly tasing him, striking him, and putting pressure on his body while he was in a prone position.

65.    The acts deprived Mr. Ringgold-D'Abell of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

66.    The excessive force Defendants Adamisin, Sellitti, Paredes, and Haverlock deployed was objectively unreasonable and intentional, undertaken with malice and knowing disregard for Mr. Ringgold-D'Abell's clearly established constitutional rights.

67.    Defendants Adamisin, Sellitti, Paredes, and Haverlock acted under the color of state law.

68.    The excessive force used by Defendants Adamisin, Sellitti, Paredes, and Haverlock directly and proximately caused Mr. Ringgold-D'Abell to be injured and his constitutional rights to be violated.

**Count II**
**Failure to Intervene**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**
**Plaintiff Imani Ringgold-D'Abell**
**Against All Defendant Officers**

69.    Plaintiffs incorporate by reference the facts alleged above.

70.    The Defendant Officers knew or had reason to know that their fellow officers were using excessive force against Mr. Ringgold-D'Abell and had both the reasonable opportunity and means to intervene.

71.    The Defendant Officers failed to intervene in the excessive force used against Mr. Ringgold-D'Abell.

72.    The failure to intervene deprived Mr. Ringgold-D'Abell of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

73.    The Defendant Officers' failure to intervene was objectively unreasonable and intentional, undertaken with malice and knowing disregard for Mr. Ringgold-D'Abell's clearly established constitutional rights.

74.    The Defendant Officers acted under the color of state law.

75.    The Defendant Officers' failure to intervene directly and proximately caused Mr. Ringgold-D'Abell to be injured and his constitutional rights to be violated.

**Count III**
**Unlawful Seizure & False Arrest**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**
**Plaintiff Imani Ringgold-D'Abell**
**Against All Defendant Officers**

76.    Plaintiffs incorporate by reference the facts alleged above.

77.    The Defendant Officers falsely arrested Mr. Ringgold-D'Abell, having placed him under arrest with no probable cause to believe he committed any crime.

78.    The Defendant Officers' actions were objectively unreasonable and intentional, undertaken with malice and knowing disregard for Mr. Ringgold-D'Abell's clearly established constitutional rights.

79.    The acts deprived Mr. Ringgold-D'Abell of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

80.    The Defendant Officers acted under the color of state law.

81.   The Defendant Officers' actions directly and proximately caused Mr. Ringgold-D'Abell to be injured and his constitutional rights to be violated.

## Count IV
## Malicious Prosecution
## 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
## Plaintiff Imani Ringgold-D'Abell
## Against Defendants Adamisin and Sellitti

82.   Plaintiffs incorporate by reference the facts alleged above.

83.   Mr. Ringgold-D'Abell was criminally prosecuted, even though no probable cause existed to support the charges.

84.   Defendants Adamisin and Sellitti made, influenced, and participated in the decision to prosecute Mr. Ringgold-D'Abell without probable cause, including by making intentionally false statements in police reports.

85.   As a consequence of the prosecution, Mr. Ringgold-D'Abell was deprived of his liberty beyond the initial seizure, including the imposition of pretrial release conditions.

86.   The acts of Defendants Adamisin and Sellitti were objectively unreasonable and intentional, undertaken with malice and knowing

disregard for Mr. Ringgold-D'Abell's clearly established constitutional rights.

87. The acts deprived Mr. Ringgold-D'Abell of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

88. Defendants Adamisin and Sellitti acted under the color of state law.

89. The acts of Defendants Adamisin and Sellitti directly and proximately caused Mr. Ringgold-D'Abell to be injured and his constitutional rights to be violated.

**Count V**
**Assault and Battery**
**State Common Law**
**Plaintiff Imani Ringgold-D'Abell**
**Against Defendants Adamisin, Sellitti, Paredes, and Haverlock**

90. Plaintiffs incorporate by reference the facts alleged above.

91. Defendants Adamisin, Sellitti, Paredes, and Haverlock harmfully and offensively touched Mr. Ringgold-D'Abell's body, including by repeatedly tasing him and striking his body without just cause, *i.e.*, when he was not resisting.

92. Defendants Adamisin, Sellitti, Paredes, and Haverlock acted intentionally and maliciously.

93.    Defendants Adamisin, Sellitti, Paredes, and Haverlock directly and proximately caused Mr. Ringgold-D'Abell to be injured.

**Count VI**
**False Arrest**
**State Law**
**Plaintiff Imani Ringgold-D'Abell**
**Against All Defendant Officers**

94.    Plaintiffs incorporate by reference the facts alleged above.

95.    The Defendant Officers falsely arrested Mr. Ringgold-D'Abell, having placed him under arrest with no probable cause to believe he committed any crime.

96.    The Defendant Officers acted intentionally and maliciously.

97.    The Defendant Officers directly and proximately caused Mr. Ringgold-D'Abell to be injured.

**Count VII**
**Malicious Prosecution**
**State Common Law**
**Plaintiff Imani Ringgold-D'Abell**
**Against Defendants Adamisin and Sellitti**

98.    Plaintiffs incorporate by reference the facts alleged above.

99.    Mr. Ringgold-D'Abell was criminally prosecuted even though no probable cause existed to support the charges.

100.    Defendants Adamisin and Sellitti made, influenced, and participated in the decision to prosecute Mr. Ringgold-D'Abell without

probable cause, including by making intentionally false statements in police reports.

101.  As a consequence of the prosecution, Mr. Ringgold-D'Abell was deprived of his liberty beyond the initial seizure, including the imposition of pretrial release conditions.

102.  Defendants Adamisin and Sellitti acted intentionally and maliciously.

103.  Defendants Adamisin and Sellitti directly and proximately caused Mr. Ringgold-D'Abell to be injured.

**Count VIII**
**Intentional Infliction of Emotional Distress**
**State Common Law**
**Plaintiff Imani Ringgold-D'Abell**
**Against All Defendant Officers**

104.  Plaintiffs incorporate by reference the facts alleged above.

105.  The Defendant Officers engaged in extreme and outrageous conduct against Mr. Ringgold-D'Abell, including subjecting him to severe physical pain by tasing him and striking his body without provocation or legal cause in the view of his young daughter.

106.  The Defendant Officers acted intentionally, maliciously, and with knowing disregard for the risk of injury to Mr. Ringgold-D'Abell.

107.  The Defendant Officers' conduct directly and proximately caused Mr. Ringgold-D'Abell's injuries, including severe emotional distress.

### Count IX
### *Monell* Municipal Liability
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
### Both Plaintiffs
### Against Defendant City of Taylor, Michigan

108.  Plaintiffs incorporate by reference the facts alleged above.

109.  Defendant City of Taylor has a custom of permitting and acquiescing to the use of excessive force.

110.  Defendant City of Taylor has been put on notice that its use-of-force training is inadequate and likely to lead to constitutional injuries by the repeated occurrences of the unconstitutional use of force by its officers, but Defendant has nevertheless failed to adequately train and supervise its police officers on the constitutional use of force.

111.  Defendant City of Taylor's actions and omissions were taken deliberately and with reckless disregard for clearly established constitutional rights.

112. Defendant City of Taylor's policies and customs were the moving force behind Plaintiffs' injuries and the violations of their constitutional rights.

**Count X**
**Excessive Force**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**
**Plaintiff La'Shanna Taylor**
**Against Defendants Haverlock and Pilchak**

113. Plaintiffs incorporate by reference the facts alleged above.

114. Ms. Taylor posed no threat to the Defendant Officers' safety. Nor did Ms. Taylor actively resist arrest, attempt to evade arrest, or attempt to interfere with police activities.

115. Defendants Haverlock and Pilchak used excessive force against Ms. Taylor without just cause, including by forcefully pushing her and aggressively restraining her arms.

116. The acts deprived Ms. Taylor of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

117. The excessive force Defendants Haverlock and Pilchak deployed was objectively unreasonable and intentional, undertaken with malice and knowing disregard for Ms. Taylor's clearly established constitutional rights.

118. Defendants Haverlock and Pilchak acted under the color of state law.

119. The excessive force used by Defendants Haverlock and Pilchak directly and proximately caused Ms. Taylor to be injured and her constitutional rights to be violated.

**Count XI**
**Unlawful Seizure & False Arrest**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**
**Plaintiff La'Shanna Taylor**
**Against Defendants Haverlock and Pilchak**

120. Plaintiffs incorporate by reference the facts alleged above.

121. Defendants Haverlock and Pilchak unlawfully seized Ms. Taylor without reasonable suspicion that she committed or was going to commit a crime. Defendants Haverlock and Pilchak's seizure of Ms. Taylor was not reasonably necessary to further any justifiable interest because Ms. Taylor posed no danger and was not going to interfere with police activities.

122. The actions of Defendants Haverlock and Pilchak were objectively unreasonable and intentional, undertaken with malice and knowing disregard for Ms. Taylor's clearly established constitutional rights.

123.   The acts deprived Ms. Taylor of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

124.   Defendants Haverlock and Pilchak acted under the color of state law.

125.   The actions of Defendants Haverlock and Pilchak directly and proximately caused Ms. Taylor to be injured and her constitutional rights to be violated.

**Count XII**
**Assault and Battery**
**State Common Law**
**Plaintiff La'Shanna Taylor**
**Against Defendants Haverlock and Pilchak**

126.   Plaintiffs incorporate by reference the facts alleged above.

127.   Defendants Haverlock and Pilchak harmfully and offensively touched Ms. Taylor's body, including by forcefully pushing her and aggressively restraining her arms without just cause.

128.   Defendants Haverlock and Pilchak acted intentionally and maliciously.

129.   Defendants Haverlock and Pilchak directly and proximately caused Ms. Taylor to be injured.

## Count XIII
## False Arrest
## State Law
## Plaintiff La'Shanna Taylor
## Against Defendants Haverlock and Pilchak

130. Plaintiffs incorporate by reference the facts alleged above.

131. Defendants Haverlock and Pilchak falsely arrested Ms. Taylor, having placed her under arrest with no probable cause to believe she committed any crime.

132. Defendants Haverlock and Pilchak acted intentionally and maliciously.

133. Defendants Haverlock and Pilchak directly and proximately caused Ms. Taylor to be injured.

## Count XIV
## Intentional Infliction of Emotional Distress
## State Common Law
## Plaintiff La'Shanna Taylor
## Against Defendants Haverlock and Pilchak

134. Plaintiffs incorporates by reference the facts alleged above.

135. Defendants Haverlock and Pilchak engaged in extreme and outrageous conduct against Ms. Taylor, including subjecting her to physical pain without provocation or legal cause in the view of her young daughter.

136. Defendants Haverlock and Pilchak acted intentionally, maliciously, and with knowing disregard for the risk of injury to Ms. Taylor.

137. The conduct of Defendants Haverlock and Pilchak directly and proximately caused Ms. Taylor injuries, including severe emotional distress.

## Relief Requested

For these reasons, Plaintiffs respectfully request judgment in their favor, including compensatory damages in an amount to be determined at trial; punitive damages against the Defendant Officers; attorneys' fees, costs, and expenses; pre-judgment and post-judgment interest; and any other relief this Court finds just and proper.

## Demand for Jury Trial

Plaintiffs, through their counsel, Salvatore Prescott Porter & Porter, PLLC, demand a jury trial in the above-captioned matter.

Dated: September 10, 2021      By:     */s/ Sarah S. Prescott*
                                       SALVATORE PRESCOTT PORTER &
                                       PORTER, PLLC

                                       Sarah S. Prescott (P70510)
                                       105 East Main Street
                                       Northville, MI 48167
                                       (248) 679-8711
                                       prescott@sppplaw.com

                                       Julie B. Porter (P81386)
                                       Andrea L. Evans (*application for
                                       admission pending*)
                                       1010 Davis Street
                                       Evanston, IL 60201
                                       (312) 283-5711
                                       porter@sppplaw.com
                                       evans@sppplaw.com

                                       *Attorneys for Plaintiffs*